IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

LOGAN DYJAK,                          )
                                      )
                 Plaintiff,           )
                                      )
vs.                                   )        Case No. 3:18-CV-1011-MAB
                                      )
JOSEPH HARPER, GREGG SCOTT,           )
MAXINE MURPHY, BREE BARNETT,          )
SHIRLEY FORCUM, and                   )
LAURIE IROSE,                         )
                                      )
                 Defendants.          )

## MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

This matter is currently before the Court on the motion for summary judgment filed by Defendants Joseph Harper, Gregory Scott, Bree Barnett, Shirley Forcum, and Laurie Irose (Doc. 131). For the reasons explained below, the motion is granted.

### BACKGROUND

Plaintiff Logan Dyjak alleges that he suffered a wide range of mistreatment while a resident at Chester Mental Health Center ("CMHC") regarding the conditions of his confinement, his diet, his medical care, and his access to personal property. He alleged that he attempted to remedy the mistreatment through the formal complaint process but got nowhere (Doc. 85). In the second amended complaint, which is the operative complaint in this matter, Plaintiff asserted the following claims:

> **Count 1 –** a claim for unconstitutional conditions of confinement against Defendants Joseph Harper, Gregg Scott, Laurie Irose, and Shirley Forcum;

**Count 2** – a claim for inadequate medical care and food against Defendants Harper, Scott, Maxine Murphy, and Bree Barnett;

**Count 3** – a Fourteenth Amendment and/or Illinois state law claim for the deprivation of his personal property without due process of law against Defendants Harper and Scott.

(Doc. 85).

Plaintiff previously reached a settlement with Defendant Maxine Murphy (Doc. 135; *see also* Doc. 136). Although the parties indicated they would move to dismiss Murphy after the settlement was finalized (Doc. 136), they have not yet done so. Given that the settlement occurred over five months ago, the Court trusts that it can safely dismiss Murphy at this time.

The other Defendants filed a motion for summary judgment on the merits of Plaintiff's claims (Doc. 131; *see also* Doc. 132). Plaintiff filed a response in opposition (Doc. 138). Defendants did not file a reply brief.

<u>FACTS</u>

A.  THE PARTIES

Logan Dyjak was involuntarily committed to the Illinois Department of Human Services in February 2013 after he was found not guilty by reason of insanity (Doc. 132-1, pp. 14–18). He was initially placed at Alton Mental Health Center ("Alton"), where he remained until February 6, 2018, when he was transferred to CMHC (*Id.*). He stayed at CMHC until August 2018, when he was transferred to McFarland Mental Health Center, where he remains today (*Id.*).

Defendant Joseph Harper was the Hospital Administrator at CMHC from March 2016 to early May 2018 (Doc. 132-3, pp. 11–12). Defendant Gregg Scott replaced Harper as the Interim Hospital Administrator in May 2018 and served for approximately a year and a half (Doc. 132-4, p. 5). As hospital administrator, Harper and Scott oversaw the overall operations of the facility (Doc. 132-3, p. 13; Doc. 132-4, p. 5).

Defendant Shirley Forcum was a licensed clinical social worker at CMHC when Plaintiff arrived there in February 2018, but on April 1, 2018, she became a Unit Director, overseeing the day-to-day activities in Unit A, which is the maximum-security unit (Doc. 132-5, pp. 11–13). Defendant Laurie Irose was, in pertinent part, the Human Rights Chairperson at CMHC, and she was responsible for receiving and reviewing formal complaints from patients (Doc. 132-6, p. 11). Defendant Bree Barnett was a Licensed Practical Nurse at CMHC (Doc. 132-7, p. 10).

## B. COMPLAINT PROCESS

If a patient at CMHC had an issue or a concern, they could approach unit staff (aides, nurses, unit manager, etc.) or they could talk to their therapist during meetings (Doc. 132-3, p. 24). They could also use the formal complaint process by filling out a complaint form, which were available on the unit, and turning it in to Laurie Irose (Doc. 132-3, pp. 24, 25–26; Doc. 132-4, p. 6; Doc. 132-6, p. 18). Ms. Irose would review the complaint and decide if it needed to be addressed (Doc. 132-6, p. 18). If so, she could investigate the complaint personally or ask the unit director to do so (*Id.*). If she passed it off to the unit director, she would review the unit director's response and decide whether it was accurate and resolved or if it needed to be forwarded on to the hospital

administrator for further action (*Id.*). Joseph Harper and Gregg Scott both acknowledged that they could become involved in the complaint process if there were questions about a patient's complaint or it was unable to be resolved at a lower level (Doc. 132-3, pp. 25–26; Doc. 132-4, p. 6; *see also* Doc. 132-5, pp. 15–17; Doc. 132-6, p. 14).

## C. PLAINTIFF'S ALLEGATIONS RE: CONDITIONS OF CONFINEMENT

### 1. Lighting

Plaintiff testified that the light in his room was on 24 hours a day, which disrupted his sleep and exacerbated his mental illness (Doc. 132-1, p. 207). Defendants testified the lighting was necessary for security purposes because CMHC is a maximum-security hospital and patients must be monitored every 15 minutes (Doc. 132-3, p. 57; Doc. 132-5, p. 59). There is no definitive evidence as to how bright the light was at night (*e.g.*, wattage, lumens, etc.). Plaintiff claimed "it was so bright . . . you couldn't tell if it was day or night . . . [even with a] window in the cell" (Doc. 132-1, p. 208). However, Ms. Irose, testified that the lights in the patients' rooms did not stay at the same illumination 24 hours a day (Doc. 132-6, pp. 46–48). She said when the light switch was flipped to the "off" position, the light did not turn all the way off but instead became "like a nightlight," which she thought was "the lowest amount of [light] that they can have" without impeding any security needs (*Id.*). Shirley Forcum similarly testified that it was a "dim light" and said, "I doubt that it can be any dimmer without being off" (Doc. 132-5, pp. 59, 61).

Plaintiff filed a complaint on March 7, 2018, about the 24-hour illumination (Doc. 132-8, pp. 1–2).[1] Ms. Irose responded on March 19th, stating she met with the Chief of Security and was told that the hallway lighting was needed for the security cameras to capture images/incidents that may occur, and therefore the lights had to remain on. Two days later, Plaintiff filed another complaint, explaining that the issue was not the lights in the hallway but the light in his room, which he said was excessively bright and could not be dimmed (Doc. 132-8, pp. 11–15). Ms. Irose responded on April 10th, stating that, according to the Chief of Security, the lighting was necessary for security because all patients have to be checked every 15 minutes and staff needs to have a clear view of the patients. Additionally, the Chief Engineer said the lights provided the minimum amount of illumination required to adequately observe patients in their rooms.

Both of Plaintiff's complaints were submitted and resolved before Gregg Scott became the hospital administrator (*see* Doc. 132-8, pp. 1–2, 11–15; Doc. 132-4, p. 5). Mr. Harper testified that he did not review Plaintiff's complaints regarding the lights, nor did he recall any other patient complaints regarding the 24/7 lighting (Doc. 132-3, p. 58).

### 2. Temperatures & Bedding

Plaintiff testified that he was forced to live in rooms with extremely cold temperatures (Doc. 132-1, pp. 50, 84, 85). While Defendants confirmed that CMHC is an old building and sometimes the rooms are cold (Doc. 132-5, p. 17; Doc. 132-6, p. 44), there

---

[1] He also indicated that he previously filed a complaint about the lighting on February 12th, which would have been his sixth day at CMHC (Doc. 132-8, pp. 1–2). Plaintiff testified that the first five or so grievances that he submitted in the days after his arrival at CMHC were never responded to (Doc. 132-1, p. 39). He refiled them all "[i]n some iteration" (*Id.* at p. 40).

is no definitive evidence as to how cold it was in Plaintiff's room. Plaintiff estimated the room temperature was in the low 50s but acknowledged he did not have a thermometer to know for sure (Doc. 132-1, pp. 50, 85). Gregg Scott testified, however, that when he made tours around the hospital, he "never . . . stepped in a room that would have been below [55 degrees] in the whole hospital" (Doc. 132-4, p. 10).

Defendants testified that the chief engineer at CMHC and their subordinate employees were responsible for regulating temperatures at the hospital (Doc. 132-3, p. 54; Doc. 132-4, p. 10). According to Joseph Harper, "there is always somebody [at the hospital] that is monitoring heating and AC systems." (Doc. 132-3, p. 55). If a patient was cold in their room, they could ask the aides or the nurses on the unit, or the unit director if they were present, to contact the engineers to check the temperature of a particular area and turn up the heat as necessary (Doc. 132-6, p. 45).

Plaintiff claimed he did not have anything in his room to adequately keep him warm (Doc. 132-1, p. 84). He only had a sheet and one knit blanket on his bed, and he was not permitted to have his coat, hoody, gloves, or hat (*Id.* at pp. 50, 77, 84). He testified he would put on extra clothes to stay warm and usually wore two pairs of pants to bed (*Id.*).

Plaintiff's first complaint in the record about these issues is dated April 15, 2018 (Doc. 132-8, pp. 51–52).[2] In the complaint, Plaintiff stated the temperature in his room was very cold and he was unable to stay warm due to inadequate bedding, inadequate

---

[2] Plaintiff was unable to say for certain if he complained about the room temperatures in any of the grievances he filed right after he arrived at CMHC that purportedly went unanswered, (Doc. 132-1, pp. 87–88).

clothing, and his low-calorie diet. He said the blankets were loosely woven and did not trap heat, and because laundry service was unreliable, he was often stuck with only one shirt and one pair of pants. Shirley Forcum responded to the complaint on April 25th and Laurie Irose signed off on the response on April 30th. Ms. Forcum stated that patients can ask for additional blankets, but there are times when the unit may be running low and unable to provide patients with more than two blankets. She further stated that she met with the Office Coordinator to discuss supply inventory on each unit and laundry turnaround time. She explained that the bedding supply may be low at times due to staffing shortages in laundry, but the facility was attempting to hire more staff, which may speed up the laundry (*see also* Doc. 132-5, pp. 27–29).

Plaintiff filed a follow-up complaint on May 6, 2018, stating that he requested additional blankets from unit aides but was denied because the aides said that each patient was only allowed to have one blanket per hospital policy (Doc. 132-8, pp. 59–60; *see also* Doc. 132-1, p. 93). Ms. Forcum responded on May 21st and reiterated that patients can request additional blankets (Doc. 132-8, p. 60). She further stated that the issue had been addressed with aides on both shifts and would be readdressed at the May staff meeting (*Id.*). Laurie Irose signed off on the complaint on May 23rd (*Id.*).

Mr. Harper testified that he did not review Plaintiff's April complaint, nor did he recall any similar complaints about inadequate bedding while he was administrator (Doc. 132-3, p. 31). Similarly, Mr. Scott testified that he did not recall any patient complaints or discussion with staff regarding cold temperatures in the facility or in patient rooms (Doc. 132-4, pp. 10, 12). Shirley Forcum testified that she could resolve complaints regarding

temperature on her own and did not have to bring in the hospital administrator (Doc. 132-5, p. 17). She further testified that no dirty bedding was given out (*Id.* at p. 31).

### 3. Clean Clothing

Plaintiff alleged that he was not given adequate clothing (*see* Doc. 138). Patients were supposed to be allowed to keep five sets of clothes in their room (Doc. 132-1, p. 79; Doc. 132-5, p. 35). Plaintiff claimed, however, he did not have five actual outfits due to issues with laundry being slow and how clothing was categorized (Doc. 132-1, pp. 79, 95). For example, he said that underwear was counted as a pair of pants and undershirts were counted as a shirt (*Id.* at pp. 95, 101). Ms. Forcum, however, said that a set of clothing was a shirt, an undershirt, a pair of pants, a pair of underwear, and a pair of socks (Doc. 132-5, p. 36).

As for laundry, patients could turn in their dirty clothes to be laundered seven days a week by putting them in the hamper in the common area (Doc. 132-1, pp. 100, 106; Doc. 132-5, pp. 30, 31). Staff would wash the patients' clothes together, which were labeled with their names, and then bring the clothes back up to the common area for the patients to pick up (Doc. 132-1, pp. 105–106; *see also* Doc. 132-5, p. 31). Ms. Forcum testified that "on a good day" laundered clothes were returned the next day (Doc. 132-5, p. 30). But if there was an issue with a washer or a dryer, or the facility was short-staffed, it might take longer (*Id.*). Plaintiff, however, testified that "whether the clothes returned was always up in air" (Doc. 132-1, p. 99–100, 106, 107). He said he might not get his clothes back within a week or even a month (*Id.*). He further stated that the laundered clothes

often went to the wrong unit or were grabbed by other patients (*Id.*). He testified that due to issues with laundry, he was "frequently" forced to wear dirty clothes (*Id.* at p. 101).

Plaintiff submitted a complaint on March 28, 2018 about various personal property issues, including the lack of adequate clothing (Doc. 132-8, pp. 30–50). In particular, he said his undershirts and underwear were being improperly counted as shirts and pants, and as a result, he was only able to have two complete sets of clothing in his room, rather than five (*Id.* at p. 34). He also complained that clothing he sent to be laundered was not being returned (*Id.* at p. 35). Laurie Irose responded on April 10th, indicating that she spoke with unit staff and security staff about Plaintiff's issues and was informed that Plaintiff had been working with his therapist regarding his personal property (*Id.* at p. 50). She suggested that he continue to do so (*Id.*).

Plaintiff submitted another complaint on April 15, 2018, complaining in part about inadequate clothing for the cold temperatures in his room (*see supra* pp 6–7; Doc. 132-8, pp. 51–52). He said that due to unreliable laundry service, patients are often stuck with only one shirt and one pair of pants (Doc. 132-8, pp. 51–52). Shirley Forcum responded on April 25th and said she had spoken with the office coordinator about turnaround time on patient's clothing and the facility was hoping to hire more staff in laundry.

### 4.  Dental Hygiene Products

Plaintiff claims that he did not have access to dental floss or an adequate toothbrush at CMHC (Doc. 132-1, p. 204). He submitted a complaint on March 7, 2018, stating that he had been attempting to get floss since he arrived at CMHC and complained that he had a corn kernel stuck in his teeth (Doc. 132-8, pp. 9–10). Laurie Irose responded

on March 19th, indicating that floss is normally available but the supply on the unit was depleted. The nurse supervisor had requested more and was simply awaiting delivery. Ms. Irose also told Plaintiff he could request to see a dental hygienist. Facility records indicate that Plaintiff was given floss on multiple occasions in March, April, May, and July 2018 when he requested it (Doc. 132-10, pp. 39, 45, 58, 64, 78).

As for the toothbrushes, Plaintiff admits he never actually went without a toothbrush while at CMHC, he just felt the quality of the state-issued toothbrush was inadequate (Doc. 132-1, pp. 204–05). Plaintiff's March 28, 2018, complaint about various personal property issues included a complaint about the toothbrushes (*see supra* p. 9; Doc. 132-8, pp. 30–50). He filed two more follow-up complaints about the toothbrushes on April 15 and May 6, 2018 (Doc. 132-8, pp. 53–54, 61–62). He was advised by Shirley Forcum and Laurie Irose that standard-length toothbrushes from outside the facility were no longer permitted for safety and security reasons due to several recent attacks by patients on staff, and the state-issued toothbrushes met the standard requirements for dental hygiene and had been approved for use by all patients (*Id.* at pp. 50, 54, 62).

### 5. Extreme Noise Levels

Plaintiff claims that he was subjected to extreme noise levels because multiple patients had personal radios that they would play "full blast . . . all day and all night" (Doc. 138, p. 7; Doc. 132-2, p. 70). Plaintiff claimed that he tried to get patients restricted from playing their radios 24/7 but was unable to do so (Doc. 132-2, p. 70–71). Shirley Forcum said she was not aware of any official policy at CMHC that required radios to be turned off at a certain point each day, however, patients were encouraged to turn off

radios by 10:30 p.m. (Doc. 132-5, p. 63). She also said Plaintiff was not allowed to use ear plugs for safety reasons (*Id.* at p. 68). It does not appear that Plaintiff filed any formal complaints about radios or excessive noise (*see* Doc. 132-8).

### D.  ALLEGATIONS RE: MEDICAL CARE

Plaintiff testified that all of his prescriptions were discontinued when he was transferred to CMHC (Doc. 132-1, pp. 191, 192). When a patient is transferred to CMHC, documentation of their medical orders, including diagnoses and prescriptions, is supposed to accompany them (Doc. 132-3, p. 51; Doc. 132-4, p. 14; Doc. 132-5, p. 37). A nurse, a medical doctor, and a psychiatrist assess the patient upon their arrival at MCHC and review the documentation sent by the transferring facility (Doc. 132-3, pp. 51–52; Doc. 132-4, p. 14; Doc. 132-5, p. 52). The medical doctor and the psychiatrist then decide whether to continue, discontinue, or change the patient's existing prescriptions and/or treatments (Doc. 132-3, pp. 50–51; Doc. 132-4, pp. 14; Doc. 132-6, p. 42). As Laurie Irose put it, "they have the right to change anything they feel is [not appropriately] working. Hence, why [the patient was] transferred to our facility" (Doc. 132-6, p. 42).

Plaintiff testified that while he was at Alton, he received tretinoin (brand name: Retin-A) and benzoyl peroxide for acne and Eucerin and Vaseline for his chapped lips and dry skin (Doc. 132-1, pp. 176–80, 187–88, 190, 192). He also received fish oil, which he claims helped with his blood pressure,[3] depression, and acne (*Id.* at pp. 176–80, 181, 182–

---

[3] A note in the medical record from the nurse practitioner indicates that fish oil does not control blood pressure but is more for treatment of high cholesterol (Doc. 132-10, p. 28). Despite multiple attempts to explain this to Plaintiff, he remained "argumentative and insistent" that he would not take anything for his high blood pressure besides fish oil (*Id.*).

83). And he received thiamine, which he said was useful for vegetarians (*Id.* pp. 176–80). He was taking/using all of these items at the time of his transfer to CMHC, with the exception of the thiamine (*Id.* at p. 179). He testified that his prescriptions were discontinued when he got to CMHC but resumed within the first month or so of being there (*Id.* at pp. 191, 192). He claims that it was "a process" to get them back and it only happened "after multiple grievances were ignored and [he] suffered from multiple conditions for an extended period of time" (*Id.* at p. 195; Doc. 138, p. 11). However, the records from CMHC indicate that the nurse practitioner ("NP") tried to see Plaintiff on February 9th—just three days after he arrived at CMHC—to discuss his prescriptions, but he was unavailable (Doc. 132-10, pp. 25, 26). The NP was then able to see him on February 13th—seven days after his arrival at CMHC (*Id.* at pp. 27–28). The NP noted that "Alton MHC records pending but no meds were on the Med Reconciliation Sheet on admission" (*Id.*). The NP restarted all the prescriptions that Plaintiff requested (Doc. 132-10, pp. 27–28). Specifically, she gave him a prescription for fish oil for 100mg, twice a day, benzoyl peroxide twice a day, tretinoin every day at bedtime, Vaseline three times a day as needed, and Eucerin twice a day as needed (*Id.*). Plaintiff later requested thiamine on March 5, 2018 and a prescription was written that same day (*Id.* at p. 34).

Plaintiff began to receive the creams and supplements the same day they were prescribed or the following day (*see* Doc. 132-10, pp. 29, 30). He continued to receive them from Nurse Barnett and other members of the nursing staff, as requested for the remainder of February and throughout his time at CMHC (*see id.* at pp. 29–31, 34–36, 39–40, 45–47, 52–53, 57–58, 64, 69, 78, 82, 90).

Plaintiff was not satisfied with his prescription for fish oil at CMHC, which was half the amount he previously received at Alton (Doc. 132-1, pp. 195, 196–197). But according to the NP, the amount he received at Alton was more than the recommended dose and she would not prescribe more than the recommended dose (Doc. 132-8, p. 29). Plaintiff also took issue with his tretinoin prescription at CMHC, which he said was a different type that he did not like because it "was alcohol-based" and "irritat[ed] [his] skin quite considerably" (Doc. 132-1, p. 195). The tretinoin prescription was eventually discontinued in April 2018 after Plaintiff refused to use it on several occasions, despite the nurses' encouragement and attempted to educate him on its use, stating he "[did not] need it, it "burned when applied," and/or he "like[d] the benzoyl peroxide better" (Doc. 132-10, p. 53; *see id.* at pp. 34, 35, 36 40, 45–47, 52).

As for Defendant Bree Barnett, Plaintiff testified that she would pass out medications on the unit and his only interactions with her were at the nurse's window where he went to get his prescriptions (Doc. 132-1, pp. 56, 60).[4] Plaintiff claimed there were occasions when Nurse Barnett would give him his over-the-counter moisturizers, Vaseline and/or Eucerin, when he had not asked for them or at a time of day that was inconvenient for him (*Id.* at pp. 200–03; *see also* Doc. 132-10, p. 26). Other times, she gave him the over-the-counter acne medication, benzoyl peroxide, in an amount he deemed insufficient (Doc. 132-1, pp. 200–03). Her notes, however, indicate that she gave Plaintiff a "generous" amount of benzoyl peroxide that was more than sufficient to cover the areas

---

[4] There was also one time where Nurse Barnett was present in the room when Plaintiff was seeing the nurse practitioner (Doc. 132-1, pp. 56, 60), but that instance seems to be immaterial to the claims at issue.

specified for application, but he still requested more, which she refused (Doc. 132-10, pp. 35, 36, 40; *see also id.* at p. 37). A subsequent note from the NP suggests that Plaintiff wanted the benzoyl peroxide not just for his face but also for his shoulders and back (*Id.* at pp. 36–37). Plaintiff also said there were times Nurse Barnett gave him the prescription acne medication, tretinoin, and it was dried up and unusable (Doc. 132-1, pp. 200–03).

## E.  ALLEGATIONS RE: INADEQUATE FOOD

As with medical orders, a patient's dietary orders are supposed to accompany them when they are transferred to CMHC (Doc. 132-3, p. 40). It is ultimately up to the medical provider at CMHC, whether that be a nurse practitioner or a physician, to continue, discontinue, or change the patient's diet (Doc. 132-3, pp. 40–41, 51; Doc. 132-4, p. 14; Doc. 132-5, pp. 37, 38). The medical provider can enlist the help of a dietitian to make recommendations regarding the patient's dietary needs, but those recommendations must be reviewed and approved by the medical provider (Doc. 132-7, pp. 15–16). All diets for patients at CMHC (even regular diets) are written as a medical order (Doc. 132-5, p. 38). Nurses do not order the diets (*see* Doc. 132-7, pp. 14–15).

Prior to Plaintiff's transfer to CMHC in February 2018, he was on a vegetarian diet at Alton, which he said was "more or less a proxy for a kosher diet, which [he] continuously had been refused" (Doc. 132-1, p. 134). He said he also had dietary orders to receive large amounts of food to keep from falling under weight, including nine milks per day, ten pieces of fruit, approximately three quarters of a cup of cottage cheese added to his breakfast tray, and double main entrees at all three meals (*Id.* at p. 128). Plaintiff admitted his diet changed frequently—more than once per year—but at the time he left

Alton, his diet had remained consistent for the longest period of time, which he estimated was a year and a half to two years (*Id.* at pp. 130, 131).

Plaintiff testified that once he arrived at CMHC, all of his dietary orders were cancelled (Doc. 132-1, p. 128). He claimed that his diet at CMHC initially consisted of 1,200 to 1,500 calories but admitted this calorie count was based solely on his personal estimations (*Id.* at p. 168; Doc. 132-2, pp. 24, 25). Plaintiff claimed he was being fed so little that he did not even have the energy to keep a dietary journal (Doc. 132-1, p. 51).

Records from Plaintiff's intake at CMHC indicate that he was a vegetarian and a referral was sent to the dietician (Doc. 132-10, p. 21). Two days later, Plaintiff asked a nurse about his diet requests, and the nurse passed the requests along to the dietician and the nurse practitioner (*Id.* at p. 26). Plaintiff then met with dietician, Maxine Murphy, for his initial dietary assessment on February 13, 2018—one week after he arrived at CMHC (Doc. 130-6; Doc. 132-9, p. 10). According to Ms. Murphy, she "didn't always have access to orders from previous facilities" during her initial nutritional assessment of each new patient (Doc. 130-2, p. 13). When she did have access to the previous orders, she followed them "probably a majority of the time" (*Id.* at p. 14). But she had the discretion to deviate from those orders based on the patient's individual needs, height and weight, medications and side effects, medical histories, etc. (*Id.* at pp. 12, 14).

Ms. Murphy noted that Plaintiff weighed 177 pounds and his ideal body weight was 160–196 (Doc. 130-6; *see also* Doc. 132-9, pp. 10–11). She remarked that he described a diet high in fruits and vegetables and low-fat skim milk, which she said appeared to be similar to a Mediterranean diet. She told him they might not always be able to provide

what he requested due to budget and supply constraints. She calculated that his diet should be 2,400 calories per day, and she recommended a vegetarian, meat-free diet like he had at Alton, as well as, milk and fruit at every meal and with the evening bedtime snack. The doctor apparently approved Ms. Murphy's recommendation for Plaintiff because the following day, Nurse Barnett logged a note that a new order had been received from the doctor for a "vegetarian diet (milk, eggs, and fish are ok), milk and fruit [with] meal and [at bedtime]" (Doc. 132-10, p. 30). Nurse Barnett testified that the nursing staff is responsible for carrying out the order, that is, recording it in the patient's chart and ensuring that it is sent to the kitchen (Doc. 132-7, pp. 15–16).

On March 7, 2018, Plaintiff wrote a complaint about his dietary orders being discontinued when he transferred to CMHC (Doc. 132-8, pp. 7–8). He said he had been trying to re-obtain them for over a month, and he was successful with some but not with others. Laurie Irose responded on March 19th, stating that treatment does not have to remain the same when a patient is transferred. Each facility has their own doctors and dieticians and they have the ability to treat patients as they deem necessary.

Plaintiff submitted a follow-up complaint on March 26th (Doc. 132-8, pp. 16–29). He claimed that because his dietary orders from Alton were not continued upon his arrival at CMHC, his hypertension was left untreated for weeks, and his rapid weight loss and constipation were not being treated at all. He wrote that the dietitian and the nurse practitioner "declined to provide treatment." It appears that he wanted to receive additional servings of fruit, milk, main entrees, and fish oil (*see id.*). Laurie Irose responded to Plaintiff's complaint on April 10th, indicating that she consulted with

"administration staff," who confirmed that the facility's doctors and dietitians have the discretion to treat patients as they deem necessary. Ms. Irose also consulted with the nursing staff regarding Plaintiff's weight and they reported he was in range of his ideal body weight. Ms. Irose also consulted with the nurse practitioner about the treatment that had been provided to Plaintiff thus far. The nurse practitioner also wrote an order for the dietitian to review Plaintiff's diet again (*Id.* at p. 29; *see also* Doc. 132-10, p. 44).

On April 23rd, Nurse Barnett logged that a new order had been received regarding Plaintiff's diet (Doc. 132-10, p. 52). It dictated Plaintiff should now receive double protein, two milks and fruit every meal and at bed, double vegetables at lunch and dinner, and house snack in addition to fruit and milk at bed (*Id.*). Shirley Forcum testified that this dietary change was the result of Plaintiff's weight loss (Doc. 132-5, p. 51). Plaintiff testified his concerns regarding adequate caloric intake and being underweight were ameliorated after this diet change (Doc. 132-1, pp. 161–64). However, he claimed the diet was still insufficient with respect to recommended daily allowances for vegetables, fiber, whole grains, micronutrients, etc., (*Id.*), and was "not . . . adequate or nutritious in terms of meeting guidelines in a sufficient enough manner to prevent serious illness or death . . . [in the] long term." (Doc. 132-2, p. 32). Plaintiff, however, admitted that he does not have any special training or educational background in nutrition; everything he knows was self-taught (Doc. 132-1, pp. 146–47; Doc. 132-2, pp. 17, 25).

Despite the dietary change, Plaintiff submitted another complaint on April 24th, claiming patient diets were deficient in calories, fruits, vegetables, fiber, amino acids, fatty acids, vitamins, minerals, and other nutrients (Doc. 132-8, pp. 57–58). Shirley

Forcum responded on May 9th, noting in part that "patients with specific dietary requirements are seen by the dietitian to insure [sic] proper nutritional needs are met." She further indicated that the administration had been reviewing the dietary program, changes may be forthcoming, and patients would be provided information as it became available. Laurie Irose signed off on the response on May 10th.

Plaintiff admitted that his transfer to CMHC was stressful, even going so far as to call it "traumatic" (Doc. 132-2, pp. 32–35). He explained that he had lived at Alton for several years and "all of my family and friends were at Alton." He said he lost all of his "attachment figures" and "main relationships" when he was transferred. Additionally, his father had passed away just days before he was transferred. He said the environment at CMHC was very different than Alton—there was 24-hour lighting; it was cold; it was noisy; it was a dangerous environment with dangerous individuals; and he lost access to a great deal of his personal property and had to throw away a lot of correspondence that had sentimental value. Plaintiff admitted that trauma and stress can cause a lot of health problems, but he did not believe it could cause weight loss (*Id.* at pp. 35, 36).

Joseph Harper testified that he was not aware of Plaintiff's dietary issues, and he did not review the April complaint regarding Plaintiff's diet (Doc. 132-3, pp. 41, 43). Gregg Scott similarly testified that he did not recall any patient complaints or discussions with staff about the adequacy of the food (Doc. 132-4, p. 15).

## F.  PLAINTIFF'S ALLEGATIONS RE: PERSONAL PROPERTY[5]

Plaintiff testified that there was a "great deal of personal property" that was transferred from Alton to CMHC that he was not allowed to access or keep in his room (Doc. 132-1, pp. 123–124). He was not allowed to have, for example, legal documents and some clothing items like his coat, hat and gloves, or a hoodie in his room (*Id.* at p. 125). There was also "quite a bit of paperwork," including letters from friends that he had to throw away because he was told he had too much personal property and had to whittle it down (*Id.*). This excess property was kept in a storage area of the building and Plaintiff had to ask staff for access to it (*Id.* at p. 126).

Plaintiff submitted a complaint on March 7, 2018 about being denied possession of "multiple classes of personal property" that was not identified as contraband on facility postings or in facility literature (Doc. 132-8, pp. 5–6). He said he was not given any explanation as to why these unspecified items were deemed "dangerous." Laurie Irose responded on March 19th. She indicated that she spoke with Plaintiff and with his therapist about his access to personal property. The therapist said a list of items was given to the unit's office coordinator and the list was reviewed and discussed with the chief of security. Some of the items were denied by security.

Plaintiff filed a follow-up complaint on March 28, 2018, challenging the denial

---

[5] In his response to the motion for summary judgment, Plaintiff stated that Count 3 was based solely on the personal property he was deprived of at CMHC, specifically, items that were transferred from Alton but he was not allowed to have or use at CMHC (Doc. 138, pp. 24–25; *see also* Doc. 85, ¶¶14, 35, 36, 37). Items that he claims were mishandled/lost during the transfer are not the subject of Count 3 (Doc. 138, pp. 24–25; *see also* Doc. 85, ¶14; Doc. 132-1, pp. 109–10).

certain items of property (Doc. 132-8, pp. 30–50). He complained that items were restricted inconsistently and arbitrarily, without rationale or notice. For example, he complained about being denied a baseball cap, sunglasses, elastic hair bands, "alcohol based deodorant," a jacket *with* a zipper, a jacket *without* a zipper, long johns with an elastic waistband, name-brand socks, shorts, earplugs, soap, lotion, shampoo, coconut oil, toothpaste, and toothbrushes. Laurie Irose responded on April 10th, indicating that she spoke with unit staff and security staff about the issues Plaintiff complained about. She was informed that Plaintiff had been working with his therapist regarding his personal property and she suggested that he continue to do so.

Shirley Forcum testified she could resolve complaints regarding personal property on her own and did not have to bring in the hospital administrator (Doc. 132-5, p. 17).

## LEGAL STANDARD

Summary judgment is proper when the moving party "shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In deciding a motion for summary judgment, "a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder." *Johnson v. Rimmer*, 936 F.3d 695, 705 (7th Cir. 2019) (quoting *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003). Rather, the court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Chelios v. Heavener*, 520 F.3d 678, 685 (7th Cir. 2008). However, the court "need not draw inferences that are supported by only speculation and conjecture." *Woods*

*v. City of Berwyn*, 803 F.3d 865, 869 (7th Cir. 2015) (citation and internal quotation marks omitted). "Only if the court can say, on that sympathetic reading of the record, that no finder of fact could reasonably rule in the unsuccessful movant's favor may the court properly enter summary judgment against that movant." *Hotel 71 Mezz Lender LLC v. Nat'l Ret. Fund*, 778 F.3d 593, 603 (7th Cir. 2015). On the other hand, summary judgment should be entered in favor of the movant "when the non-moving party fails to establish 'the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial,' . . . because 'a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *FKFJ, Inc. v. Vill. of Worth*, 11 F.4th 574, 585 (7th Cir. 2021) (quoting *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006)).

As an initial matter, the Court must determine the proper legal standard for analyzing Plaintiff's claims. Plaintiff asserted that his conditions of confinement claim (Count 1) and medical claim (Count 2) were brought under the Eighth Amendment, while his personal property claim (Count 3) was brought under the Fourteenth Amendment due process clause (Doc. 33; Doc. 85). And in arguing their motion for summary judgment, Defendants applied the Eighth Amendment deliberate indifference standard Counts 1 and 2 (*see* Doc. 132). As the Court previously instructed, however, the Eighth Amendment does not govern Plaintiff's claims (Doc. 45 p. 2 n.2). It is well-established that claims brought by civilly committed detainees and other pretrial detainees challenging their conditions of confinement are governed by the Fourteenth Amendment's Due Process Clause, not the Eighth Amendment, which applies to

convicted prisoners. *Smith v. Dart*, 803 F.3d 304, 309–10 (7th Cir. 2015) (citing *Kingsley v. Hendrickson*, 576 U.S. 389, 400–01 (2015)); *Sain v. Wood*, 512 F.3d 886, 893 (7th Cir. 2008) (citing *Collignon v. Milwaukee Cty.*, 163 F.3d 982, 988 (7th Cir. 1998)). And it is equally well-established that the Fourteenth Amendment protects civilly committed detainees' right to be housed under "humane conditions" and provided with "adequate food, shelter, clothing, and medical care." *Youngberg v. Romero*, 457 U.S. 307, 315 (1982); *Sain*, 512 F.3d at 893 (citation omitted); *Collignon*, 163 F.3d at 988.

In the past, a Fourteenth Amendment due process claim by a pretrial or civil detainee regarding their conditions of confinement was analyzed under the same standard as a prisoner's post-conviction claims of the same type: the Eighth Amendment's deliberate indifference standard. *Hardeman v. Curran*, 933 F.3d 816, 822 (7th Cir. 2019). *See, e.g., Smith*, 803 F.3d at 310 (collecting cases). It has since been determined, however, that all manner of Fourteenth Amendment claims brought by pretrial and civil detainees, from excessive force to inadequate medical care to general conditions of confinement, are governed by the standard of objective reasonableness set forth by the Supreme Court in *Kingsley*. *Hardeman*, 933 F.3d at 823 (citing *Kingsley*, 576 U.S. at 396–397); *McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 886 (7th Cir. 2018).[6] Under this standard,

---

[6] The Court notes there is another potentially relevant standard of review: the "professional judgment" standard set forth by the Supreme Court in *Youngberg v. Romero*, 457 U.S. 307 (1982). Under this deferential standard, "a professional's decision ʹis presumptively validʹ and ʹliability may be imposed only when the decision by the professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment.ʹ" *Johnson v. Rimmer*, 936 F.3d 695, 707 (7th Cir. 2019) (citing *Youngberg*, 457 U.S. at 323). The *Youngberg* standard, however, applies only when the conditions of confinement claim implicates a mental-health treatment decision. *Lane v. Williams*, 689 F.3d 879, 882–83 (7th Cir. 2012). *See also Johnson*, 936 F.3d at 707, 708–10 (applying *Youngberg* standard to decision to remove patient at state mental institution from 1:1

the plaintiff must show that he faced conditions that posed an objectively serious threat to his health, the defendant "acted purposefully, knowingly, or perhaps even recklessly" with respect to the conditions of confinement, and that the defendant's actions were *objectively* unreasonable, meaning "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." *Hardeman*, 933 F.3d at 827 (Sykes, J., concurring) (citing *Kingsley*, 576 U.S. at 398). *Accord Williams v. Ortiz*, 937 F.3d 936, 942 (7th Cir. 2019). The plaintiff need not show that the defendant was *subjectively* aware that the conditions posed a significant risk of harm, as would be required for an Eighth Amendment deliberate indifference claim brought by a convicted prisoner. *McCann*, 909 F.3d at 886; *Miranda*, 900 F.3d at 350.

In evaluating objective reasonableness, the court must consider the totality of facts and circumstances. *Kingsley*, 576 U.S. at 397; *Mays v. Dart*, 974 F.3d 810, 819 (7th Cir. 2020), *cert. denied*, 142 S. Ct. 69 (2021); *McCann*, 909 F.3d at 886. The determination must be made "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." *Kingsley*, 576 U.S. at 397. And the court "must also account for the 'legitimate interests that stem from [the government's] need to manage the facility in which the individual is detained,' appropriately deferring to 'policies and practices that in the judgment' of [facility]

---

observation); *Walker v. Jumper*, 758 Fed. Appx. 521, 523 (7th Cir. 2019) (applying *Youngberg* standard to civil detainee's claim that he was denied treatment for his serious mental disorder because his treatment has been conditioned on taking polygraph tests). Here, Plaintiff's claims regarding medical care and general conditions of confinement are unrelated to the mental health treatment he was receiving, and therefore, the *Youngberg* professional judgment standard is inapplicable.

officials 'are needed to preserve internal order and discipline and to maintain institutional security.'" *Kingsley*, 576 U.S. at 397 (quoting *Bell v. Wolfish*, 441 U.S. 520, 540 (1979)); *Mays*, 974 F.3d at 820 (citation omitted).

**DISCUSSION**

### A. COUNT 1 – CONDITIONS OF CONFINEMENT

To recap, in Count 1 against Defendants Joseph Harper, Gregg Scott, Laurie Irose, and Shirley Forcum, Plaintiff challenges conditions of his confinement at CMHC, including the 24-hour illumination; extreme noise levels; extremely cold temperatures; inadequate and/or dirty bedding; inadequate and/or dirty clothing; and the denial of dental hygiene products.

To begin, the Court notes that Plaintiff did not support his allegation about stained and/or dirty bedding with any factual evidence, nor did he make any arguments as to why it amounted to a constitutional violation (*see* Doc. 138). Plaintiff has therefore abandoned this aspect of his conditions of confinement claim. *E.g., Nichols v. Michigan City Plant Plan. Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("[T]he non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

Plaintiff's allegations about dental hygiene products are likewise not supported by sufficient facts or argument. The evidence shows Plaintiff went without floss for approximately the first month and a half he was at CMHC, which was problematic on one occasion when he had a corn kernel stuck in his teeth (Doc. 138, pp. 6, 15, 22; Doc. 132-8, p. 9). Certainly this qualifies as an annoyance and a frustration. But it is not a

problem of constitutional magnitude. Plaintiff does not cite to any other facts or offer any explanation to otherwise convince the Court that the lack of floss posed an objectively and sufficiently serious threat to his health (*see* Doc. 138). The same goes for his allegations about a toothbrush. Plaintiff only mentions a toothbrush one time in his entire response brief, when he said he never went without a toothbrush at CMHC but the state-issued toothbrushes were inadequate and made his gums bleed (Doc. 138, p. 6; Doc. 132-1, pp. 204–05). This vague assertion, unsupported by any details (such as the duration and extent of the bleeding) or dental records is insufficient to raise the inference that the state-issued toothbrushes posed an objectively and sufficiently serious threat to his health. Once again, Plaintiff offers no explanation, makes no argument, and cites to no legal authority to convince the Court otherwise (*see* Doc. 138). *See Puffer v. Allstate Ins. Co.*, 675 F.3d 709, 718 (7th Cir. 2012) ("[A]rguments that have been raised may still be waived . . . if they are underdeveloped, conclusory, or unsupported by law."). *See also MBM Holdings LLC v. City of Glendale*, 843 Fed. App'x. 5, 8 (7th Cir. 2021) ("It is the responsibility of the litigants to raise coherent legal claims, produce factual support, and develop reasoned arguments supported by citation to legal authority") (citations omitted).

With respect to the extreme noise Plaintiff was purportedly exposed to, it does not appear that he ever filed a formal complaint on the matter (*see* Doc. 132-8; Doc. 138). He offers absolutely no evidence or argument that Joseph Harper, Gregg Scott, or Laurie Irose were aware of his issue with the noise or the harm it was purportedly causing him or that their response was objectively unreasonable (*see* Doc. 138). He claims only that Shirley Forcum was aware of his complaints regarding the noise level (Doc. 138, p. 14).

However, the testimony he cited to does not support his assertion (*Id.* (citing Doc. 132-5, pp. 61–62)). Shirley Forcum testified "at times," "over the years" patients had complained about other patients falling asleep with their radios on (Doc. 132-5, p. 62). In other words, she was generally aware that these types of complaints had occasionally been made in the past. She never testified that she was aware of Plaintiff's present complaints regarding noise (*see* Doc. 132-5). Furthermore, Plaintiff provides no evidence as to how Ms. Forcum purportedly responded to his complaints or any argument as to why that response was objectively unreasonable (*see* Doc. 138). Because Plaintiff did not actually argue or demonstrate that the noise level was a constitutional violation for which Defendants Harper, Scott, Irose, or Forcum could be held responsible, he has waived this aspect of his claim. *Dorris v. Unum Life Ins. Co. of Am.*, 949 F.3d 297, 306 (7th Cir. 2020) (issue waived where party "cited no legal authority and included only one sentence of justification in the fact section of her response brief"); *Ajayi v. Aramark Bus. Servs., Inc.*, 336 F.3d 520, 529 (7th Cir. 2003) ("It is not enough for [the plaintiff] merely to refer generally to these actions in her statement of facts . . . she must identify the legal issue, raise it in the argument section of her brief, and support her argument with pertinent authority).

That leaves Plaintiff's claims that he had to live with 24-hour lighting, cold temperatures, inadequate bedding, and inadequate clothing.

### 1.  Hospital Administrators Joseph Harper & Gregg Scott

"For constitutional violations under § 1983, 'a government official 'is only liable for his or her own misconduct.'" *Taylor v. Ways*, 999 F.3d 478, 493 (7th Cir. 2021) (quoting *Locke v. Haessig*, 788 F.3d 662, 669 (7th Cir. 2015)). A supervisor cannot be liable for the

misconduct of their subordinates simply because they are in charge. *See Taylor*, 999 F.3d at 493 ("There is no such thing as *respondeat superior* liability for government officials under § 1983.") (citation omitted); *Lennon v. City of Carmel, Indiana*, 865 F.3d 503, 507–08 (7th Cir. 2017) ("[T]here is no vicarious liability in a suit under section 1983."). Rather, a supervisor can be liable only if he participated directly in the constitutional deprivation or if he knew about the deprivation and facilitated it, approved it, condoned it, or turned a blind eye to it. *Taylor*, 999 F.3d at 493–94, 495. *See also Mitchell v. Kallas*, 895 F.3d 492, 498 (7th Cir. 2018) ("[P]ersonal-involvement requirement is satisfied if the constitutional violation occurs at a defendant's direction or with her knowledge or consent.").

Here, the evidence shows that while Mr. Harper and Mr. Scott may have been generally aware of the conditions Plaintiff complained of—*e.g.*, lights were left on overnight, temperatures varied throughout the facility, etc.—there is nothing that suggests they were aware of Plaintiff's specific complaints or the harm he alleged he was suffering. In particular, there is no evidence that Harper or Scott were personally involved in reviewing or responding to any of Plaintiff's formal complaints (*see* Doc. 132-8). They did not sign off on any of the complaints, (*see id.*), and they do not recall ever seeing a complaint from Plaintiff (Doc. 132-3, pp. 31, 43, 52, 58; Doc. 132-4, p. 6). In fact, Mr. Scott was not the hospital administrator at time Plaintiff's complaints regarding lighting, cold temperatures, or inadequate clothing/untimely laundry were submitted and resolved (*see* Doc. 132-8, pp. 1–2, 11–15, 30–50, 51–52). While Plaintiff cites to testimony that a complaint *could* be escalated to the hospital administrator if it was unable to be resolved at the lower level (Doc. 138, pp. 2, 17 (citing Doc. 132-5, pp. 14, 16; Doc.

132-6, pp. 13, 17, 19, 41, 42)), he does not cite to any evidence demonstrating that any of his complaints were *actually* escalated to Mr. Harper or Mr. Scott (*see* Doc. 138).

Plaintiff also claims that he wrote letters to Mr. Harper and Mr. Scott. He does not, however, recall when the letters were sent or what they said (Doc. 132-1, pp. 22–24, 27–28). And he did not cite to any evidence that Mr. Harper or Mr. Scott ever received those letters (*see* Doc. 138). Mr. Harper, for his part, has no recollection of ever receiving a letter from Plaintiff (Doc. 132-3, p. 27).

Consequently, there is no basis for holding Joseph Harper or Gregg Scott liable on Count 1, and they are entitled to summary judgment.

### 2. Laurie Irose & Shirley Forcum

In order to hold Ms. Irose and Ms. Forcum liable, Plaintiff must show that their response to his complaints about his conditions of confinement were objectively unreasonable. But Plaintiff did not put forth any evidence or argument from which a reasonable jury could reach that conclusion. Rather, the evidence shows that Ms. Forcum or Ms. Irose responded to each of Plaintiff's complaints that were received. They consulted with facility staff when necessary and provided him with answers regarding each of his concerns. For example, with respect to the 24-hour lighting, the Chief of Security and the Chief Engineer were consulted, and they reported that the nighttime lighting was necessary for security reasons and could not be dimmed any further. While Plaintiff disagrees with their opinions, no reasonable jury would find Ms. Irose's response was objectively unreasonable just because she did not get the nighttime lights turned off like Plaintiff wanted. "Correctional administrators must have 'substantial discretion to

devise reasonable solutions to the problems they face,' particularly when safety and security interests are at stake." *Mays v. Dart*, 974 F.3d 810, 820–21 (7th Cir. 2020) (quoting *Florence v. Bd. of Chosen Freeholders of Cty. of Burlington*, 566 U.S. 318, 326 (2012)). The nighttime lighting was obviously related to the facility's legitimate objective of maintaining the safety and security. And Plaintiff has not put forth any evidence, aside from perhaps his own amateur opinion, that it was so excessive in relation to the facility's security concerns as to be tantamount to punishment. Moreover, Plaintiff could have talked to his therapist about the lighting compromising his sleep and exacerbating his mental illness, but there is no indication that he ever did (*see* Doc. 138, Doc. 132-10).

As for the cold temperatures and bedding, Plaintiff was told he could ask for extra blankets. When he said his requests were denied, Ms. Forcum made sure to tell unit staff they could give patients additional blankets. Plaintiff did not provide any explanation as to why Ms. Forcum's responses were unreasonable (*see* Doc. 138). Furthermore, Plaintiff could have simply asked unit staff to turn up the heat on the nights he was cold, but there is no indication that he ever tried (*see* Doc. 138, Doc. 132-1, Doc. 132-2).

Finally, when it comes to Plaintiff's complaint about inadequate clothing, it was explained why there might be delays with his laundry, which was completely outside of Ms. Irose and Ms. Forcum's control. He was also told to work with his counselor regarding how his clothing was categorized and how many items he was allowed. Once again, Plaintiff did not provide any explanation as to why these responses were outside the range of reasonableness (*see* Doc. 138).

In sum, Plaintiff has failed to establish a material issue of fact as to whether Ms.

Forcum and Ms. Irose's responses to his complaints were objectively unreasonable. Consequently, they are entitled to summary judgment as to Count 1.

## B. COUNT 2 – INADEQUATE MEDICAL CARE AND DIET

In Count 2 against Defendants Bree Barnett, Joseph Harper, and Gregg Scott, Plaintiff claims that CMHC personnel refused to provide him with nutritional supplements and medications he had been prescribed at Alton including fish oil, Vaseline, Eucerin, benzyl peroxide, and tretinoin (Doc. 85, ¶17; Doc. 138). As a result, Plaintiff alleges that he experienced severe hypertension, frequent numbness and pain caused by a lack of blood circulation, constipation and bleeding, chapped and bleeding lips, dry skin, acne, blackouts, and occasional temporary limb paralysis (*Id.*). He further claims that he received an inadequate diet at CMHC, which caused him to fall underweight (Doc. 85; Doc. 138).

### 1. Nurse Bree Barnett

With respect to his medical care, Plaintiff alleges that Nurse Barnett knew of his medical needs and intentionally failed to provide for them (Doc. 85, ¶32). Specifically, she would give him medications he did not need and refused to give him others that he did need, or she would give him too much or too little (Doc. 138, pp. 10, 11, 22–23). As for his diet, Plaintiff alleges that Nurse Barnett failed to continue the diet he was on at Alton (Doc. 85, ¶16; Doc. 138, pp. 23–24).

Turning first to the issue of Plaintiff's diet, the evidence before the Court is that Nurse Barnett did not, and in fact could not, order changes to Plaintiff's diet. If Plaintiff complained to her about some aspect of his diet, she was supposed to refer the complaint

to the dietician and/or medical professional (Doc. 132-7, pp. 15–16). There is no evidence in the record that Nurse Barnett ever failed to pass along Plaintiff's complaints about his diet (*see* Doc. 138). And Plaintiff makes no specific argument as to how Nurse Barnett was otherwise responsible for his purportedly inadequate diet (*see* Doc. 138, pp. 23–24).

As for his medical care, it is debatable whether Plaintiff suffered from any objectively serious medical condition. But even assuming that he did, he has failed to show that Nurse Barnett should be held liable. Occasionally giving Plaintiff over-the-counter creams for dry skin when he did not want them caused him absolutely no harm, especially considering he could ask for them later in the day when he was ready for them (*see* Doc. 132-10, pp. 27–28 (prescribing Vaseline three times a day as needed and Eucerin twice a day as needed)). Additionally, there is no evidence that suggests Nurse Barnett acted purposefully, knowingly, or recklessly—as opposed to simply negligently—in allowing the tretinoin to dry out on occasion. He also has not shown that these alleged instances caused him any harm, and how could he when the records demonstrate he rarely, if ever, requested the tretinoin and he routinely refused it when offered during the two and a half months he had the prescription (Doc. 132-10, pp. 29–53). Finally, it was not objectively unreasonable for Nurse Barnett to dispense only enough benzoyl peroxide for the affected area as specified in the NP's order and to refuse Plaintiff's demands for more; in fact, it is precisely how a nurse is supposed to administer prescriptions.

In sum, Bree Barnett was a nurse. She could not write prescriptions or issue medical orders. The evidence in the case demonstrates that she recorded when new orders were received, dispensed medications in the amount prescribed at the time

prescribed, and assessed Plaintiff's complaints regarding his medical condition and passed them along when necessary (*see* Doc. 132-10, pp. 30, 34–36, 40, 45, 52, 73; Doc. 132-7, pp. 23–24, 25, 26). It is unclear how any reasonable jury could possibly view her actions as objectively unreasonable, and she is entitled to summary judgment as to Count 2.

### 2. Defendants Joseph Harper and Gregg Scott

Plaintiff argues that Harper and Scott failed to ensure that his medical care and diet were continued and provided for at CMHC (Doc. 85; Doc. 138). The Court disagrees. The evidence demonstrates that there were policies in place to ensure continuity of care. Specifically, the transferring facility was supposed to send the patient's medical orders to CMHC. Those orders were to be reviewed by a medical professional at CMHC, who would then determine whether any changes were necessary. In this instance, it appears that Alton did not send information regarding Plaintiff's prescriptions when he was transferred to CMHC (*see* Doc. 132-10, pp. 21, 28). To the extent that is true, it is the fault of the staff at Alton, not Joseph Harper or Gregg Scott. Furthermore, Harper and Scott did not have any role in assessing patients when they arrived at CMHC, determining the proper course of care, or prescribing treatments. Rather, they relied on the medical professionals and dietitians to do so. It is well-established that it is objectively reasonable for non-medical staff at the facility, including administrators, to trust the professionals to provide appropriate care. *McCann v. Ogle Cty., Illinois*, 909 F.3d 881, 888 (7th Cir. 2018); *Miranda v. Cty. of Lake*, 900 F.3d 335, 343 (7th Cir. 2018). *See also Rasho v. Elyea*, 856 F.3d 469, 478–79 (7th Cir. 2017) (holding that medical professionals were not liable when sued in their capacity as "prison administrators and policymakers, not treaters"); *Berry v.*

*Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (underscoring that the law "encourages non-medical security and administrative personnel . . . to defer to the professional medical judgments of the physicians and nurses treating the prisoners in their care without fear of liability for doing so").

Furthermore, there is no evidence that Harper or Scott had any reason to know of Plaintiff's complaints that he was being inadequately treated. As already discussed, there is no evidence that Harper or Scott were personally involved in reviewing or responding to Plaintiff's formal complaints regarding his diet and medical care. Plaintiff has not put forth any evidence that Mr. Harper or Mr. Scott received his letter(s) and neither of the men have any recollection of ever receiving a letter from Plaintiff. It appears that Plaintiff's primary argument for holding Mr. Harper and Mr. Scott liable is that they were "ultimately responsible for the health and safety of the patients" (Doc. 138, p. 24). But this argument sounds in respondeat superior, which as previously explained, is not a basis for holding an individual in a supervisory position liable under § 1983. For these reasons, Mr. Harper and Mr. Scott are entitled to summary judgment on Count 2.

## C. COUNT 3 – PERSONAL PROPERTY

In his response to the motion for summary judgment, Plaintiff stated that Count 3 was based solely on the personal property he was deprived of at CMHC, specifically, items that he was not allowed to have or use (Doc. 138, pp. 24–25; *see also* Doc. 85, ¶¶14, 35, 36, 37). He alleges the denial of his personal property was in violation of CMHC's policies, state law, and without due process of law (Doc. 85, ¶¶36, 37; Doc. 138, p. 12). He further alleges that Defendants Joseph Harper and Gregg Scott were liable because they

failed to adequately train and/or supervise CMHC staff to comply with Illinois rules

protecting patient personal property rights (*Id.* at ¶35). *See* 405 ILL. COMP. STAT. 5/2-104,

5/2-201; 59 ILL. ADMIN. CODE § 110.30.

Civil detainees "may claim the protection of the Due Process Clause to prevent . .

. deprivation of . . . property without due process of law." *Caldwell v. Miller*, 790 F.2d 589,

608 (7th Cir. 1986) (citing *Bell v. Wolfish,* 441 U.S. 520, 545 (1979)). A detainee's due process

rights are not absolute, however, and are subject to reasonable limitation or retraction in

light of the legitimate security needs of the facility or other legitimate, non-punitive

governmental objectives. *Bell*, 441 U.S. at 539, 546–47; *Caldwell*, 790 F.2d at 609.

Here, there is a complete dearth of evidence from which a reasonable jury could

rule in Plaintiff's favor. Plaintiff does not discuss what personal items he was prohibited

from possessing (*see* Doc. 138). He also did not discuss what staff member made the

decision to restrict his property, when the decision was made, the context in which it was

made, or the training that the relevant staff member received regarding these type of

decisions (*see* Doc. 138). He also did not discuss the applicable state regulations or

CMHC's policies regarding personal property (*see* Doc. 138). As such, it is impossible to

determine whether he was deprived of a protected property interest, and if so, whether

it was pursuant to a formal policy or a random and unauthorized deprivation, whether

he received the process he was due,[7] let alone whether any purported due process

---

[7] When the deprivation is caused by a random and unauthorized confiscation of property, there is no due process violation so long as there is a meaningful post-deprivation remedy for the loss. *Murdock v. Washington*, 193 F.3d 510, 513 (7th Cir. 1999)); *Stewart v. McGinnis*, 5 F.3d 1031, 1035, 1036 (7th Cir. 1993) (citing *Hudson v. Palmer*, 468 U.S. 517 (1984)). Plaintiff does not contend that he was without a post-

violation was attributable to Mr. Harper and Mr. Scott's failure to adequately train and/or supervise CMHC staff. Consequently, Mr. Harper and Mr. Scott are entitled to summary judgment as to Count 3.

CONCLUSION

Following Plaintiff's settlement with Defendant Maxine Murphy (*see* Doc. 135), Murphy is **DISMISSED with prejudice** as a Defendant in this matter, each party to bear their own fees and costs unless otherwise provided in the settlement documents.

The motion for summary judgment filed by Defendants Joseph Harper, Gregory Scott, Bree Barnett, Shirley Forcum, and Laurie Irose (Doc. 131) is **GRANTED**. Plaintiffs' claims against these Defendants are **DISMISSED** with prejudice. The Clerk of Court is **DIRECTED** to enter judgment in their favor and close this case on the Court's docket.

**IT IS SO ORDERED.**

**DATED: February 28, 2022**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**

---

deprivation remedy (*see* Doc. 138), and in fact, the Seventh Circuit has held that he was not because he can file a tort claim in the Illinois Court of Claims. *Peters v. Zhang*, 803 Fed.Appx. 957, 959 (7th Cir. 2020); *Stewart*, 5 F.3d at 1036. Alternatively, when personal property is confiscated according to a formal policy, due process requires a meaningful opportunity for the detainee to be heard on the issue of whether the property should be permitted. *Stewart*, 5 F.3d at 1037 (citing *Castaneda v. Henman,* 914 F.2d 981, 985 (7th Cir. 1990)).